## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RICHARD EDELMAN,

        *Plaintiff*,

    v.

SECURITIES AND EXCHANGE
COMMISSION,

        *Defendant*.

Civil Action No. 14-1140 (RDM)

## <u>MEMORANDUM OPINION</u>

Between 2011 and 2013, the limited liability corporation that owned the Empire State Building was merged with other entities in a contentious process that led to the creation of a real estate investment trust called Empire State Realty Trust, Inc.  One of the shareholders who opposed the transaction is a California resident named Richard Edelman.  Between January and April 2014, Edelman filed six requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, with the Securities and Exchange Commission ("SEC") for documents that related to the formation of Empire State Realty Trust.  By July 2014, Edelman had received responses from the SEC to some of his requests, but not to others, and the SEC had produced no responsive documents.  In an effort to compel the SEC to produce documents responsive to his requests, Edelman filed this FOIA action.

The SEC has now responded to all six of Edelman's requests and has produced over 2,000 pages of responsive records.  Having done so, the Commission moves for summary judgment, arguing that it conducted an adequate search for responsive records and withheld only information it is authorized to withhold under FOIA.  Edelman has cross-moved for summary

judgment, arguing that the SEC has not shown that it conducted an adequate search and that it

has improperly withheld records not protected by the Act.  For the reasons set out below, the

Court will grant in part and deny in part each party's motion.

## I. BACKGROUND

### A.    Factual Background

Richard Edelman is a former investor in the Empire State Building.  Compl. ¶ 3.  For

several years, he has operated a website that provides information to investors and the public

regarding the contentious process of converting the ownership of the Empire State Building into

a real estate investment trust.  Compl. ¶¶ 3, 5–11; *see* www.empirestatebuildinginvestors.com

(last updated Mar. 18, 2016).  Among other things, he has posted documents filed with and

issued by the SEC, which was required to approve the creation of the trust, known as the Empire

State Realty Trust, Inc., or ESRT for short.  Compl. ¶¶ 7–11.  This action arises out of six FOIA

requests that Edelman submitted to the SEC in order to obtain documents about its review of the

proposed transaction.  Because the procedural history of these requests differs, the Court will

describe them request-by-request.

### 1.    *Request No. 14-03043 (ESRT/SEC Communications)*

Edelman sent the first of these FOIA requests to the SEC on January 6, 2014.  Dkt. 15-3

at 2 (Livornese Decl., Ex. 1).  In that request, he described several filings submitted by ESRT to

the SEC and sought "all comment letters from SEC staff not currently displayed on [the] SEC

public website"; "all submissions from [ESRT] in response to SEC comment letters"; "all

submissions from [ESRT] submitted under" 17 C.F.R. § 200.83, which permits persons to

request that filings be shielded from FOIA; "all emails to and from SEC attorney[s] David

Orlick, Tom Kluck, and Angela McHale"; and "all notes from meetings" attended by those

attorneys.  *Id.*  Although the SEC acknowledged the receipt of Edelman's request, and assigned it

a processing number (No. 14-0343), it did not provide a substantive response within the 20-day

period in which the statute requires an agency to respond to a FOIA request.  Dkt. 16-2 at 15

(Edelman Aff., Ex. A); *id.* at 6 (Edelman Aff. ¶ 19); *see* 5 U.S.C. § 552(a)(6)(A)(i).

Edelman appealed the constructive denial of his FOIA request on March 26, 2014.  Dkt.

16-2 at 40 (Edelman Aff., Ex. H); *see* 17 C.F.R. § 200.80(d)(6).  On April 16, 2014, the associate

general counsel of the SEC, Richard Humes, acknowledged that the statutory timeframe had not

been met and remanded the request to the agency's FOIA office for processing.  *Id.* at 57

(Edelman Aff., Ex. J).  The FOIA office did not provide a substantive response, and on July 3,

2014, Edelman brought this action.  Dkt. 1.  Finally, on September 30, 2014, the SEC responded

to this request (and to Edelman's third FOIA request, discussed below).  *See* Dkt. 15-3 at 12

(Livornese Decl., Ex. 5).  It produced 2,034 pages of records responsive to the two requests.  *Id.*

at 13.  The SEC withheld nine responsive pages in full under FOIA Exemptions 5 and 6 and

redacted other material on the basis of those exemptions.  Dkt. 15-1 at 5–6 (Livornese Decl. ¶

16).  The SEC informed Edelman that it had also located "notes . . . from SEC meetings"

attended by Orlick, Kluck, and McHale, but had determined that "the majority of these notes . . .

are for [the attorneys'] personal use and convenience," and were not subject to FOIA.  Dkt. 15-3

at 14 (Livornese Decl., Ex. 5).

2.     *Request No. 14-03257 (Sublease Documents)*

Edelman sent a second FOIA request to the SEC on January 8, 2014.  *See* Dkt. 15-3 at 17

(Livornese Decl., Ex. 6).  He requested any exhibits filed by ESRT or the predecessor LLC "that

reference the Sublease of the Empire State Building"; all submissions filed by either entity under

17 C.F.R. § 200.83 that referenced the Sublease; "any and all emails" to or from any SEC

employee referencing the Sublease; "any notes from SEC meetings" in which the Sublease was mentioned; and "any notes from phone conversations or correspondence of any nature between the SEC" and both entities, or their representatives, in which the Sublease was mentioned. *Id.* at 17–18. The SEC acknowledged the request and assigned it a processing number (No. 14-03257), but again did not provide a substantive response within 20 days. Dkt. 16-2 at 19 (Edelman Aff., Ex. B); *id.* at 6 (Edelman Aff. ¶ 19).

Edelman appealed the constructive denial of his FOIA request on March 26, 2014. Dkt. 16-2 at 41 (Edelman Aff., Ex. H). On April 16, 2014, Humes acknowledged that the statutory timeframe had not been met and remanded the request to the agency's FOIA office. *Id.* at 57 (Edelman Aff., Ex. J). The FOIA office once again did not provide a substantive response, and on July 3, 2014, Edelman brought this action. Dkt. 1. The SEC ultimately responded to this request on September 3, 2014. Dkt. 15-3 at 20 (Livornese Decl., Ex. 7). It produced 215 pages of records that it viewed as potentially responsive to the portion of Edelman's request referring to e-mails. *Id.* at 21. The SEC withheld portions of these records under Exemptions 5 and 6. *Id.* It also explained that, with respect to the rest of Edelman's request, it had either found no records or found no records not available on the SEC's public website. *Id.* at 21–22.

3.    *Request No. 14-03398 (Confidential Documents)*

Edelman sent his third FOIA request to the SEC on January 10, 2014. Dkt. 15-3 at 25 (Livornese Decl., Ex. 8). This request sought "any and all documents submitted by [ESRT] and granted confidential treatment" under any of three SEC rules permitting confidential filings. *Id.* Edelman also requested each document's submission date and subject, and the name of the SEC official who granted ESRT leave to file the document confidentially. *Id.* The SEC assigned the

4

request a processing number (No. 14-03398) but did not provide a substantive response within 20 days.  Dkt. 16-2 at 22 (Edelman Aff., Ex. C); *id.* at 6 (Edelman Aff. ¶ 19).

Edelman appealed the constructive denial of his FOIA request on March 26, 2014.  Dkt. 16-2 at 42 (Edelman Aff., Ex. H).  On April 16, 2014, Humes acknowledged that the statutory timeframe had not been met and remanded the request to the agency's FOIA office.  *Id.* at 57 (Edelman Aff., Ex. J).  On April 29, 2014, seemingly unaware of the appeal or the remand, the SEC responded to Edelman's request by informing him that it had "conducted a thorough search," but had not identified any responsive records.  *Id.* at 63 (Edelman Aff., Ex. L).  The subsequent day, April 30, it sent him a letter acknowledging the remand.  *Id.* at 65.  Finally, on May 6, 2014, the SEC sent Edelman a third letter that more fully described his original request and reiterated the agency's original conclusion that no responsive records existed.  *See* Dkt. 15-3 at 27 (Livornese Decl., Ex. 9).  Edelman did not appeal, and instead filed this action.  Dkt. 1.

4. *Request No. 14-03452 ("Consumer Complaints")*

Edelman sent a fourth FOIA request to the SEC on January 15, 2014.  *See* Dkt. 15-3 at 5 (Livornese Decl., Ex. 2).  Using the SEC's online FOIA form, Edelman selected "Consumer complaints" as the "[t]ype of document" he sought in this request.  *Id.*; *see Request for Copies of Documents*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/forms/request_public_docs (last visited Mar. 23, 2016).  He described a set of complaints submitted by Empire State Building investors to the SEC during its review of the proposed transaction, and alleged that the same SEC lawyers whom he named in his first request—Orlick, Kluck, and McHale—had interviewed the investors who had submitted the complaints.  *See* Dkt. 15-3 at 5 (Livornese Decl., Ex. 2).  He requested "all notes, reports, emails or any other accounts from these interviews" and "all emails to and from the . . . SEC lawyers where those complaints and interviews are discussed."  *Id.*  The

SEC assigned Edelman's request a processing number (No. 14-03452) but did not provide a substantive response within 20 days.  Dkt. 16-2 at 25 (Edelman Aff., Ex. D); *id.* at 6 (Edelman Aff. ¶ 19).

Edelman appealed the constructive denial of his FOIA request on March 26, 2014.  Dkt. 16-2 at 42 (Edelman Aff., Ex. H).  On April 16, 2014, Humes acknowledged that the statutory timeframe had not been met and remanded the request to the agency's FOIA office.  *Id.* at 57 (Edelman Aff., Ex. J).  On April 30, 2014, the SEC issued a *Glomar* response to Edelman's request, asserting that it could "neither confirm nor deny the existence of any records responsive to [his] request."[1]  Dkt. 15-3 at 7 (Livornese Decl., Ex. 3).  On May 19, 2014, Edelman filed an appeal of the Commission's *Glomar* response, and on July 2, 2014, Humes remanded the request to the agency's FOIA office.  *Id.* at 10 (Livornese Decl., Ex. 4).  Having not yet received Humes's response, Edelman brought this action the next day.  Dkt. 1.  On September 30, 2014, the SEC issued a combined response to this request and Edelman's first FOIA request.  *See* Dkt. 15-3 at 12 (Livornese Decl., Ex. 5).  As described more fully above, it produced 2,034 pages of records responsive to the two requests, but withheld some material on the basis of FOIA Exemptions 5 and 6.  *Id.* at 13.

5.    *Requests No. 14-06366 to 14-06369 (ESRT E-mails and FOIA Records)*

Edelman sent his fifth FOIA request to the SEC on March 27, 2014.  *See* Dkt. 15-3 at 30 (Livornese Decl., Ex. 10).  He requested e-mails and letters between the SEC and ESRT, as well as e-mails and letters between the SEC and Malkin Holdings, the company advocating the

---

[1]  An agency may issue a so-called *Glomar* response "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *see also People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014); *Phillippi v. CIA*, 655 F.2d 1325, 1327–28 (D.C. Cir. 1981).

conversion of the Empire State Building's ownership structure into a real estate investment trust. *Id.* He also requested e-mails, letters, and notes from meetings and phone conversations between the SEC's FOIA office and other SEC departments about FOIA requests regarding ESRT and/or Malkin Holdings. *Id.* He finally requested the same materials regarding the SEC's Division of Corporate Finance. *Id.* The SEC informed Edelman that it would treat his request as four FOIA requests (one for e-mails and letters between ESRT and the SEC, a second for e-mails and letters between Malkin and the SEC, a third for communications about FOIA requests regarding ESRT, and a fourth for communications about FOIA requests regarding Malkin). *Id.* at 32 (Livornese Decl., Ex. 11). It assigned his requests four processing numbers (No. 14-06366 through No. 14-06369), but did not provide a substantive response within 20 days. *Id.*; Dkt. 16-2 at 6 (Edelman Aff. ¶ 19).

Edelman appealed the constructive denial of his FOIA request on May 20, 2014. Dkt. 16-2 at 44 (Edelman Aff., Ex. H). The SEC acknowledged his appeal, *id.* at 52 (Edelman Aff., Ex. I), but did not provide a substantive response, and on July 3, 2014, Edelman filed this suit, Dkt. 1. The SEC responded to Edelman's requests in September 2014. On September 3, 2014, it informed him that it had identified no records responsive to Request No. 14-06367; identified and released 36 pages in response to Request No. 14-06368; and identified no records responsive to Request No. 14-06369. Dkt. 15-3 at 36 (Livornese Decl., Ex. 12), 42 (Ex. 14), 45 (Ex. 15). The SEC withheld portions of several pages under Exemptions 5 and 6. *Id.* at 42–43. On September 18, 2014, the SEC informed Edelman that it had identified and was releasing two pages in response to Request No. 14-06366, but that it had withheld portions of these pages under Exemption 6. *Id.* at 39 (Ex. 13).

6.       *Request No. 14-06652 (Intragovernmental Communications Regarding ESRT)*

Edelman submitted his final FOIA request to the SEC on April 4, 2014.  Dkt. 15-3 at 48

(Livornese Decl., Ex. 16).  There, he requested "letters [and] e-mails to the SEC" and "notes

from meetings or phone calls with the SEC from any government official" *not* employed by the

SEC regarding ESRT.  *Id.*  The SEC assigned the request a processing number (No. 14-06652)

but, as with the preceding requests, did not provide a substantive response within 20 days.  Dkt.

16-2 at 34 (Edelman Aff., Ex. F); *id.* at 6 (Edelman Aff. ¶ 19).

Edelman appealed the constructive denial of his FOIA request on May 9, 2014.  Dkt. 16-

2 at 45 (Edelman Aff., Ex. H).  On June 3, 2014, Humes acknowledged that the 20-day statutory

timeframe had not been met and remanded the request to the agency's FOIA office.  *Id.* at 55

(Edelman Aff., Ex. I).  The FOIA office did not provide a substantive response, and on July 3,

2014, Edelman brought this action.  Dkt. 1.  The SEC responded to this request on July 17, 2014.

Dkt. 15-3 at 50 (Livornese Decl., Ex. 17).  It told Edelman that it had not found any responsive

records.  *Id.*

## B.       Procedural Background

Edelman brought this suit on July 3, 2014, to compel the SEC to respond to his FOIA

requests.  Dkt. 1.  He seeks injunctive and declaratory relief, as well as an award of costs and

fees.  *Id.* at 9–10.  As noted above, after Edelman brought suit, the SEC responded to the five

FOIA requests that were still outstanding.  The Commission then moved for summary judgment,

arguing that it had conducted adequate searches in response to all of Edelman's requests and that

all of its withholdings were permitted by FOIA.  Dkt. 15.  The SEC supports its motion with the

declarations of two SEC officials—John Livornese, the SEC's FOIA officer, and Patti Dennis,

the official responsible for FOIA requests at the SEC's Division of Corporate Finance—and a

26-page *Vaughn* index.  *See* Dkts. 15-1, 15-2, 15-5.  Edelman cross-moved for summary

judgment, arguing that the SEC's search was inadequate and that its withholdings are not

permitted under FOIA.  Dkt. 16.  The motions are now fully briefed.  Dkts. 18, 20.

## II.  LEGAL FRAMEWORK

The Freedom of Information Act is premised on the notion that an informed citizenry is

"vital to the functioning of a democratic society, needed to check against corruption and to hold

the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214,

242 (1978).  The Act embodies a "general philosophy of full agency disclosure."  *U.S. Dep't of*

*Defense v. FLRA*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352,

360–61 (1976)).  It thus mandates that an agency disclose "agency records" on request, unless

they fall within one of nine exemptions.  "These exemptions are 'explicitly made exclusive' and

must be 'narrowly construed.'"  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA*

*v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).  As explained

further below, the present dispute turns in part on the meaning and application of Exemption 5.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be

available by law to a party other than an agency in litigation with the agency."  *See* 5 U.S.C. §

552(b)(5).  It exempts "those documents, and *only* those documents, normally privileged in the

civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (emphasis

added).  The dispute also turns on the meaning of the phrase "agency records," which the statute

does not define.

FOIA cases are typically resolved on motions for summary judgment under Federal Rule

of Civil Procedure 56.  *See, e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175

(D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate

that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56. In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and an index of the information withheld, *Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973); *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). An agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the [FOIA's] inspection requirements." *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

## III.  DISCUSSION

### A.  Exhaustion

The SEC first argues that its response to Edelman's third request (No. 14-03398), which sought confidential documents submitted by ESRT, is not properly before the Court because Edelman failed to exhaust any challenge to that action. *See* Dkt. 15 at 5. "A FOIA requester is generally required to exhaust administrative appeal remedies before seeking judicial redress." *Citizens for Responsibility & Ethics in Washington v. FEC* (*CREW*), 711 F.3d 180, 184 (D.C. Cir. 2013). FOIA requires agencies to respond to a request for records within 20 business days. *See* 5 U.S.C. § 552(a)(6)(A)(i). If an agency fails to respond within this period, the requester is "deemed to have exhausted his administrative remedies" with respect to that request and may bring a FOIA action. *Id.* § 552(a)(6)(C)(i). But if the agency does respond, the requester is

obligated to appeal any adverse response "to the head of the agency" before bringing suit.  *Id.* §
552(a)(6)(A)(i); *CREW*, 711 F.3d at 184.  The purpose of this rule is to provide the agency "an
opportunity to exercise its discretion and expertise on the matter and to make a factual record to
support its decision." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990).  But the
requirement is not jurisdictional.  *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003).

The procedural history of Edelman's third request is more complicated than the history of
Edelman's other requests.  As explained above, Edelman sent this request to the SEC on January
10, 2014.  Dkt. 15-3 at 25 (Livornese Decl., Ex. 8).  When the SEC failed to respond to it within
20 days, he filed an appeal with the Commission rather than bringing suit immediately.  Dkt. 16-
2 at 42 (Edelman Aff., Ex. H).  On April 16, the SEC's associate general counsel remanded the
request to the FOIA office.  *Id.* at 57 (Edelman Aff., Ex. J).  Then, without mentioning the
remand, the Commission responded to Edelman's request on April 29 by telling him that it had
located no responsive records.  *Id.* at 63 (Edelman Aff., Ex. L).  It told him that he had "the right
to appeal the adequacy of [its] search or finding of no responsive information." *Id.*  The
following day, April 30, the SEC sent Edelman a second letter.  *Id.* at 65.  This letter
acknowledged the remand, stated that an SEC employee had been assigned to process it, and
explained that Edelman would be "notified of the findings as soon as possible." *Id.*  Finally, on
May 6, the SEC sent Edelman a third letter that more fully described his original request,
reiterated the agency's conclusion that no responsive records existed, and told Edelman that he
had the right to appeal the response.  *See* Dkt. 15-3 at 27 (Livornese Decl., Ex. 9).  Edelman did
not appeal the agency's response.

The SEC argues that Edelman failed to exhaust his challenge to the adequacy of its
search for responsive records by not appealing its May 6, 2014 response.  Dkt. 15 at 5.  The

Court agrees.  The SEC remanded Edelman's request to the FOIA office on April 16, 2014.  *See*

Dkt. 16-2 at 57 (Edelman Aff., Ex. J).  The Commission then provided a substantive response to

the request nine business days later, on April 29, and an additional substantive response five

business days after that, on May 6.  *See id.* at 63 (Edelman Aff., Ex. L); Dkt. 15-3 at 27

(Livornese Decl., Ex. 9).  Edelman concedes that he did not file an appeal from either response.

Under the ordinary rule, Edelman should have appealed the office's response in order to permit

the SEC to "exercise its discretion and expertise" regarding the adequacy of the office's search.

*See Oglesby*, 920 F.2d at 61.

Edelman advances two arguments as to why his failure to appeal the agency's decision on

remand should be excused.  First, he argues that because he could have proceeded directly to

court before filing his *initial* appeal—because he would have been "deemed to have exhausted

his administrative remedies," 5 U.S.C. § 552(a)(6)(C)(i)—he should be permitted to file suit at

any point thereafter.  But the D.C. Circuit has considered and rejected a form of this argument.

In *Oglesby*, the plaintiff submitted FOIA requests for records to six agencies, only one of which

met the statutory deadline.  920 F.2d at 65.  The other five nonetheless "completed their review

and made their initial determinations on [Oglesby's] requests long before [Oglesby] brought

suit."  *Id.*  Oglesby argued that he was not required to appeal the determinations in such a

circumstance, because he *could have* taken advantage of FOIA's constructive exhaustion rule to

sue before the agencies had made their determinations.  *Id.* at 62.  But the D.C. Circuit rejected

his claim, interpreting the statute to "requir[e] the completion of the administrative appeal

process before courts become involved, if the agency has responded to the request before suit is

filed."  *Id.* at 65.  That rule applies here as well.  If "an administrative appeal is mandatory if the

agency cures its failure to respond within the statutory period by responding to the FOIA request

before suit is filed," *id.* 63, it stands to reason that the appeal is mandatory even if the agency's failure to respond initially is "cured" only after a remand.[2]  Even accepting the view of the facts most favorable to Edelman, the SEC cured its initial failure to respond to his FOIA request in a timely manner by responding no later than May 6, 2014, and arguably as early as April 29, 2014. Because it did so, Edelman cannot now rely on the SEC's initial failure to timely respond to the request to excuse his failure to file an appeal from the Commission's subsequent decision.

Edelman also argues that the purposes of the exhaustion requirement are not implicated when a FOIA requester takes an initial appeal and an agency remands in response.  In essence, he argues that a FOIA requester should be deemed to have exhausted his administrative remedies if he exhausts them *once*, and to be permitted to proceed to court at any reasonable point thereafter.  There may be circumstances under which requiring an appeal after an agency remands a case to the processing officer would not further the purposes of the exhaustion requirement.  For instance, where an agency initially responds to a FOIA request on the merits, the requester appeals, and the agency issues the *same* response on remand, the requester might argue that the purposes of the exhaustion requirement would not be furthered by an additional— and arguably futile—appeal.  But this is not such a case.  Here, the Commission initially failed to respond at all, and Edelman elected to appeal rather than file suit in order to permit it an opportunity to do so.  He then received a response on the merits on remand, just as the statute contemplates—and, indeed, that his appeal contemplated.  If he believed that the SEC's response was inadequate, his obligation was to file an appeal, just as he had done earlier.  His failure to do

---

[2]  The Court need not decide whether Edelman could have relied on the constructive-denial rule to file suit *after* the remand but *before* the processing officer responded to the request, because here Edelman filed suit *after* the processing officer responded to his request, thus triggering the *Oglesby* rule.

so deprived the SEC's "top managers" of the opportunity to exercise their discretion to expand

the search or to determine that there were in fact responsive records—that is, "to correct

mistakes," if any, "made at lower levels and thereby obviate[] unnecessary judicial review."

*Oglesby*, 920 F.2d at 61.  Because he did not appeal, the Court will not consider his challenge to

the search here.[3]

### B.    Searches

With respect to the five remaining requests, Edelman argues that the SEC conducted

inadequate searches.  An agency has an obligation under FOIA to conduct an adequate search for

responsive records.  "An agency fulfills [this] obligation[] . . . if it can demonstrate beyond

material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325–26 (D.C. Cir. 1999) (quoting *Truitt v.

Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  "In order to obtain summary judgment the

agency must show that it made a good faith effort to conduct a search for the requested records,

using methods which can be reasonably expected to produce the information requested."

*Oglesby*, 920 F.2d at 68.  Although the agency "cannot limit its search to only one record system

if there are others that are likely to turn up the information requested," it need not "search every

record system."  *Id.*  The agency can show that it conducted an adequate search by relying on

"[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed,

and averring that all files likely to obtain responsive records (if such records exist) were

searched."  *Valencia-Lucena*, 180 F.3d at 326 (internal quotation marks omitted).

---

[3]  In any event, Edelman's briefs make no specific challenge to the SEC's response to his third
request.  Thus, even were the Court to consider Edelman's claim regarding this request on the
merits, there would be little or no basis on which to grant summary judgment in his favor.

Edelman's arguments focus on the SEC's searches in response to his second request (for documents relating to the Empire State Building sublease) and his fourth request (for documents related to consumer complaints).  Accordingly, the Court will address these searches individually before considering the overall adequacy of the SEC's effort.

1.   *Edelman's Second Request (Sublease)*

Edelman's second FOIA request (No. 14-03257) sought "all information" transmitted between SEC employees and ESRT (and its predecessor entity) between January 12, 2012, and April 11, 2012, regarding the Empire State Building Sublease, including e-mails sent to or from SEC employees about the Sublease; "any notes from SEC meetings" in which the Sublease was mentioned; "any notes from phone conversations or correspondence of any nature between the SEC" and both entities, or their representatives, in which the Sublease was mentioned; any filings by ESRT or its predecessor referencing the Sublease; and any *confidential* filings by either entity referencing the Sublease.  Dkt. 15-3 at 17–18 (Livornese Decl., Ex. 6).  The SEC broke the request into five subcomponents and performed searches for documents falling into each subcomponent.  Dkt. 15-1 at 6 (Livornese Decl. ¶¶ 17, 20–21); Dkt. 15-2 at 3–5 (Dennis Decl. ¶¶ 8–13).  It ultimately found 215 pages of e-mail correspondence responsive to the first component of Edelman's request.  Dkt. 15-2 at 4 (Dennis Decl. ¶ 9).  It found no other responsive documents that the SEC had not already posted to its website.  *Id.* at 4–5 (Dennis Decl. ¶¶ 10–13).

Edelman argues that the SEC's search was "inadequately narrow."  Dkt. 16-1 at 16.  But he fails to support this conclusory allegation.  His chief complaint is that the agency "furnished no records" responsive to four of five subcomponents of his request.  *Id.*  But "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of

the methods used to carry out the search." *See Iturralde v. Comptroller of Currency*, 315 F.3d

311, 315 (D.C. Cir. 2003).  And the declarations submitted by the SEC demonstrate that its

efforts were adequate and its methods well-tailored to Edelman's request.  Patti Dennis, who

oversees FOIA requests in the SEC's Division of Corporate Finance, conducted the search for

records responsive to this request.  Dkt. 15-2 at 4 (Dennis Decl. ¶ 9).  She attests that she

searched for notes from meetings, phone conversations, and correspondence relating to the

sublease (the second and third subcomponents of Edelman's request) by reaching out to the

"staff responsible for ESRT review" and asking them to search for documents.  *See id.* (Dennis

Decl. ¶ 10).  These employees provided a log that they used to "track and share information"

relating to ESRT, including "notes from meetings and phone conversations."  *Id.*  Dennis

examined the log for "the term[s] 'lease' and 'sublease' and found no responsive entries."  *Id.*

        In addition, to locate ESRT's confidential submissions to the SEC—the fifth

subcomponent of the request—Dennis searched "non-public EDGAR," an internal database of

letters and responses submitted confidentially to the SEC that is not available to the public.[4]  *Id.*

at 5 (Dennis Decl. ¶ 12); *see also* Dkt. 15-1 at 3–4 (Livornese Decl. ¶ 11–12) (defining "non-

public EDGAR" and attesting that the SEC's "routine practice is to scan and upload all

submissions with Rule 83 confidentiality requests to non-public EDGAR").  She did not find any

responsive records.  Dkt. 15-2 at 5 (Dennis Decl. ¶ 12).  With respect to exhibits filed by ESRT

or its predecessor regarding the Sublease, Dennis attests that she "determined that any exhibits

referencing the Sublease were public documents available on the SEC's website."  *Id.* at 4

(Dennis Decl. ¶ 11).  Finally, Dennis attests that she searched for records that might be

responsive to the first subcomponent of Edelman's request by searching for the words "Empire

---

[4]  EDGAR stands for the "Electronic Data Gathering, Analysis, and Retrieval" database.

State" and "sublease" in the e-mail archives of all SEC staff "who were directly and tangentially involved in the filing review." *Id.* (Dennis Decl. ¶ 9). Dennis's declaration thus makes clear that the SEC engaged in a good-faith search using methods reasonably calculated to locate the information Edelman requested.

Edelman nonetheless faults the SEC for failing to "consider[] the possibility of[] other sources of 'information or communications' between SEC employees and" ESRT and its predecessor entity. Dkt. 16-1 at 16. As a general matter, Edelman fails to identify what "other sources" might harbor communications between SEC employees and ESRT, and he therefore fails to offer support for his broad attack on the Commission's search methodology. With respect to one subcomponent of the search, however, he raises a more specific concern. As described by the SEC, that subcomponent sought "all information or communications between SEC employees and Empire State Building Associates LLC or [ESRT] and their representatives" during a designated period "in which the Sublease for the Empire State Building . . . is mentioned, including any and all emails from or to" certain SEC employees. Dkt. 15-2 at 3 (Dennis Decl. ¶ 8). Dennis explains that, in response, she collected and reviewed e-mails sent to various SEC employees. *Id.* at 4 (Dennis Decl. ¶ 9). But, as Edelman notes, that only captures a portion of the relevant request, which also sought "notes from phone conversations or correspondence" between ESRT and the SEC, "exhibits" filed by ESRT with the SEC," and "submissions" from ESRT to the SEC. Dkt. 15-3 at 17–18 (Livornese Decl., Ex. 6).

Although Edelman is correct that Dennis's description of her search for records responsive to the first subcomponent of the request is narrower than the corresponding portion of the request, that error is immaterial in light of the overlap between the first subcomponent of the request and its other subcomponents. Dennis describes the second, third and fourth

subcomponents, for example, as seeking "notes from SEC meetings where the sublease" was mentioned, "notes from phone conversations or correspondence of any nature between the SEC and Empire State Building Associates LLC, [ESRT], or their representatives where the Sublease for the Empire State Building was mentioned," and "exhibits filed by Empire State Building Associates LLC or [ESRT] that reference the Sublease."  Dkt. 15-2 at 3 (Dennis Decl. ¶ 8). Dennis did not limit her searches with respect to these subcomponents to e-mails, and, in light of the the overlap between the subcomponents, there is no reason to believe that the SEC's *overall* search for responsive material would not have identified any material responsive to the first subcomponent of the request.

The Court, accordingly, concludes that the SEC conducted an adequate search in response to Edelman's second request.

2.    *Edelman's Fourth Request ("Consumer Complaints")*

The bulk of Edelman's arguments concern the SEC's searches in response to his fourth request (No. 14-03452)—his request for documents related to "consumer complaints."  Edelman argues that (1) the SEC erred in concluding that notes taken by SEC attorneys were not records subject to FOIA; (2) the SEC construed his request too narrowly by searching only for documents *about* consumer complaints, rather than for the complaints themselves; and (3) even presuming that the SEC interpreted his request accurately, it conducted an inadequate search for documents about consumer complaints.  Dkt. 16-1 at 14–16; Dkt. 20 at 5–16.  The Court agrees with Edelman's first two arguments, and accordingly orders the SEC to conduct additional searches in response to this request.  The Court agrees with the SEC, however, that the searches it did conduct were reasonable and adequate, for the reasons set out below.

a.     Attorney Notes

Edelman's first argument is that the SEC erred in failing to treat notes taken by several SEC attorneys as "agency records" subject to FOIA.  *See* Dkt. 16-1 at 15–16; Dkt. 20 at 11–16. In its search for records responsive to Edelman's first and fourth FOIA requests, the SEC found 113 pages of notes taken by three SEC attorneys, but declined to produce them on the ground that they "were not agency records."  Dkt. 15-2 at 2 (Dennis Decl. ¶ 7).  Although the record is not entirely clear, it appears that the attorneys took these notes during agency meetings regarding ESRT and while participating in calls between the SEC and investors regarding ESRT.  Dkt. 18-1 at 2 (Second Dennis Decl. ¶¶ 3–4).  Patti Dennis, who oversaw portions of the SEC's searches, attests that the notes were made "during [the attorneys'] review of the ESRT transaction . . . to keep track of what [they] had done and what [they] needed to do."  *Id.* at 3 (Second Dennis Decl. ¶ 7).  She explains that "[n]o one instructed [the attorneys] to keep the notes, or provided any guidance on what notes to take"; that they "were not required to make or keep the notes"; and that they "kept their notes in their individual SEC offices," "did not share them with each other or any other SEC employee," and "did not place or incorporate [them] into the SEC's file on the ESRT transaction."  *Id.*  Accordingly, the SEC argues, the notes are not "agency records" subject to FOIA.

Surprisingly, it is an open question within this circuit whether notes taken by individual agency employees in the course of performing their official duties are "agency records" subject to FOIA.  *See Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice* (*BNA*), 742 F.2d 1484, 1492–93 (D.C. Cir. 1984) (noting, but not resolving, the issue).  The district judges who have considered the question have held, by and large, that they are not.  *See Fortson v. Harvey*, 407 F. Supp. 2d 13, 15–16 (D.D.C. 2005); *Bloomberg, L.P. v. SEC*, 357 F. Supp. 156, 166–67

(D.D.C. 2004); *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 11 (D.D.C. 1995); *AFGE Local 2782 v. U.S. Dep't of Commerce*, 632 F. Supp. 1272, 1277 (D.D.C. 1986); *British Airports Auth. v. Civil Aeronautics Bd.*, 531 F. Supp. 408, 415 (D.D.C. 1982); *see also Families for Freedom v. U.S. Customs & Border Protection*, No. 10-2705, 2011 WL 4599592, at *6–7 (S.D.N.Y. Sept. 30, 2011) (finding employee notes constituted "agency records," but only on the ground that they were likely "produc[ed] for use by other agency personnel").  For the reasons discussed below, however, the Court disagrees and concludes that FOIA and the relevant caselaw do not support the categorical exclusion of notes taken and used solely by individual agency employees from the statute's reach.

FOIA grants the district courts "jurisdiction to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld" from the plaintiff.  5 U.S.C. § 552(a)(4)(B); *see also Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980).  As the Supreme Court and the D.C. Circuit have repeatedly noted, however, the statute does not define the term "agency records," and its legislative history provides little relevant guidance.  *See Forsham v. Harris*, 445 U.S. 169, 178 (1980); *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 216 (D.C. Cir. 2013); *Consumer Fed. of America v. Dep't of Agriculture* (*CFA*), 455 F.3d 283, 287 (D.C. Cir. 2006); *BNA*, 742 F.2d at 1488.  Moreover, neither the Supreme Court nor the D.C. Circuit has adopted a hard-edged definition of "agency records"—at least as the phrase applies to documents created by federal employees in the course of their employment.  Because these courts' treatment of that term has differed based on the nature of the documents at issue, the Court will briefly outline the key cases on the issue.

The Supreme Court first addressed the definition of "agency records" in a pair of cases in 1980.  The first case, *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, established the centrality of the concept of *control* to the analysis.  In *Kissinger*, several reporters and news organizations sought a set of notes, summaries, and transcripts that documented phone conversations between Secretary of State Henry Kissinger and his contacts, both personal and official.  *See id.* at 140.  Kissinger and the government argued that the notes were not "agency records," but rather were personal in nature.  *Id.* at 141–42.  The lower courts granted summary judgment to the FOIA requesters with respect to those notes taken while Kissinger was Secretary of State, but ruled for the government with respect to notes taken while Kissinger was a White House advisor, reasoning that the Office of the President was not an "agency" under FOIA, and that the simple fact that Kissinger had taken the notes with him to the State Department did not make them the Department's records.  *Id.* at 145–46.  The Supreme Court affirmed that judgment with respect to the records Kissinger had taken while serving as a White House advisor, but it reversed with respect to those records he had taken while serving as Secretary of State, holding that, even if those records were "agency records," the State Department could not have withheld them because they were no longer under the Department's control.  *Id.* at 154–56.  The Court thus left unresolved the question whether notes and transcripts of calls in which some agency business was conducted could be considered "agency records" under FOIA.

The second 1980 case, *Forsham v. Harris*, 445 U.S. 169, emphasized the importance of *possession* to the analysis.  In *Forsham*, the plaintiffs filed a number of FOIA requests with the Department of Health, Education, and Welfare ("HEW"), seeking the raw data generated and used by a federal grantee in the process of studying diabetes treatments.  *See id.* at 171.  The Supreme Court held that the raw data did not count as an agency record, stating "an agency must

21

. . . either create or obtain a record as a prerequisite to its becoming an 'agency record' within the meaning of the FOIA." *Id.* at 182. Because HEW never obtained the data, it was not an "agency record," and FOIA did not apply. *Id.* at 186.

These two strands of the caselaw were brought together a decade later in the *Tax Analysts* litigation. *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060 (D.C. Cir. 1988), *aff'd sub nom. U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989). In that case, the publisher of the *Tax Notes* magazine filed a FOIA request with the U.S. Department of Justice, seeking copies of all district court tax opinions and final orders identified in the Tax Division's weekly logs. 845 F.2d at 1063. The Department denied the request on the ground that the opinions and orders were not "agency records," and the district court sustained the withholding. *Id.* The D.C. Circuit reversed. *See id.* at 1067–69. Adopting a test borrowed from the Eleventh Circuit, it held that the question of whether records were "agency records" turned on four factors:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Id.* at 1069 (quoting *Lindsey v. Bureau of Prisons*, 736 F.2d 1462, 1465 (11th Cir.), *vacated on other grounds*, 469 U.S. 1082 (1984) (per curiam)). Applying that test, the D.C. Circuit held that the tax opinions and orders were "agency records." *Id.* at 1067.

The Supreme Court granted certiorari and affirmed. 492 U.S. at 138. But it declined either to embrace or reject the four-factor test. It stated instead that "[t]wo requirements emerge from *Kissinger* and *Forsham*"—"[f]irst, an agency must 'either create or obtain' the requested materials," and "[s]econd, the agency must be in control of the requested materials at the time the FOIA request is made." *Id.* at 144–45. Applying those two factors, the Court held that there was

no doubt that the Department of Justice had both *obtained* and *controlled* the tax opinions—and so there was no doubt that they were "agency records." *Id.* at 146–47. This was so, the Court held, even though the Department had no authority to alter or amend the content of the opinions, and even though the opinions were not created for the purpose of assisting the Department. *Id.* at 147. As the Court explained, the "intent of the creator of a document relied upon by an agency" does not matter, *id.*; what matters is that the document came "into the agency's possession in the legitimate conduct of its official duties," *id.* at 145.

The continuing vitality of the four-factor test established by the D.C. Circuit in the *Tax Analysts* litigation is not entirely clear. On the one hand, the D.C. Circuit has continued to apply that test in many subsequent cases, explaining that it fleshes out the requirement that records be in the agency's *control. See United We Stand America, Inc. v. IRS*, 359 F.3d 595, 599 (D.C. Cir. 2004); *see also Burka v. HHS*, 87 F.3d 508, 515 (D.C. Cir. 1996). And many of the district courts to have considered whether employees' notes are 'agency records' under FOIA have relied upon the four-factor test, *see, e.g.*, *Fortson*, 407 F. Supp. 2d at 15; *Bloomberg*, 357 F. Supp. 2d at 162–63, much as the parties urge the Court to do here, *see* Dkt. 18 at 7; Dkt. 20 at 12. On the other hand, the D.C. Circuit has just as often eschewed the four-factor test in analyzing whether a document is an "agency record," instead employing one of several other approaches more sensitive to the facts and circumstances of each case. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 220–21 (D.C. Cir. 2013) (noting the "considerable indeterminacy" of the framework and instead applying an alternate test used to address whether records created by Congress are "agency records"); *United We Stand America*, 359 F.3d at 600 (same); *see also Cause of Action v. Nat'l Archives & Records Admin.*, 753 F.3d 210, 214–15 (D.C. Cir. 2014)

(calling the framework "problematic" and "declin[ing] to use" it); *Gallant v. NLRB*, 26 F.3d 168, 171–72 (D.C. Cir. 1994) (citing but not applying the framework).

In two cases somewhat analogous to the present one, the D.C. Circuit has considered the question of when a record—in those cases, an employee's calendar—is an *agency* record rather than a *personal* one. *See CFA*, 455 F.3d at 285–86; *BNA*, 742 F.2d at 1486–87. The first of these cases, *BNA*, was decided before the D.C. Circuit and the Supreme Court decided the *Tax Analysts* case. The *BNA* Court, eschewing the categories adopted by some other circuits in the wake of *Kissinger* and *Forsham*, rejected any effort to "compartmentalize" the issue "rigidly into either a 'control' or a 'use' analysis." 742 F.2d at 1490. Instead, the D.C. Circuit stressed that the inquiry "must focus on a variety of factors surrounding the creation, possession, control, and use of the document by an agency." *Id.* The second case, *CFA*, was decided after both *Tax Analysts* decisions, but it also looked to the "totality of the circumstances . . . to distinguish 'agency records' from personal records." *CFA*, 455 F.3d at 287 (citing *BNA*, 742 F.2d at 1490). In doing so, the *CFA* Court quoted the *Tax Analysts* four-factor test in a footnote, *id.* at 287 n.7, but—over the objection of the concurring judge, *see id.* at 293–94 (Henderson, J., concurring)— relied primarily on *BNA* as the "template" for resolving the appeal, *id.* at 288 (majority opinion). In both cases, because the calendars at issue were "created by agency employees and were located within the agency," *CFA*, 455 F.3d at 289, the question whether the calendars were *agency* records or *personal* records turned on the "control" and the "use" of the calendars—that is, (1) whether the agency or the employee controlled the calendars and (2) the manner in which the calendars were used within the agency, *id.* at 289–93; *BNA*, 742 F.2d at 1494. In each case, the analysis ultimately came down to the *use* of the calendars, and in particular the question whether the calendars were used to "facilitate[] the day-to-day operations of the" agency or were

24

used only "'for the convenience of the individual official[]' in organizing his 'personal and business appointments.'" *See CFA*, 455 F.3d at 288 (quoting *BNA*, 742 F.2d at 1495–96).

The "totality of the circumstances" test applied in *CFA* and *BNA*—rather than the four-factor framework used in *Tax Analysts*—best fits this case. As in *CFA* and *BNA*, the present dispute is not over who controls records created by another entity (as it was in *Tax Analysts*) but rather over whether records created by an employee should be attributed to the employee or to the agency. *Cf. BNA*, 742 F.2d at 1492 ("[T]he question presented by these cases is whether, when an employee creates a document, that creation can be attributed to the agency under FOIA."). As a threshold matter, however, it is plain that even *CFA* and *BNA* do not precisely fit the question presented, since the notes at issue here are unlike the calendars in those cases in one important way: there is no assertion that the notes contain any *personal* content at all. It was difficult to assess whether the calendars in *CFA* and *BNA* (as well as, for that matter, the records in *Kissinger*) were *agency* records or *personal* records because they contained references to "personal appointments wholly unrelated to the business of the" agency as well as official appointments. *See CFA*, 455 F.3d at 288, 292; *BNA*, 742 F.2d at 1496. By contrast, the notes in this case contain no personal content whatsoever, or at least the SEC has not suggested that they do. According to Dennis, who oversaw the search for responsive records, the notes were taken "during [the attorneys'] review of the ESRT transaction"—that is, in the course of the attorneys' official duties. Dkt. 18-1 at 3 (Second Dennis Decl. ¶ 7). Dennis does not suggest that the notes contain any content that is *not* related to the attorneys' work at the SEC. The SEC merely argues that the notes are not agency records because, although the attorneys created them in furtherance of their official duties, they did so individually, not at the agency's behest. This differs from the

concern that animated the D.C. Circuit's opinions in *CFA* and *BNA*—or at least it was not the

primary concern manifested in those opinions.

There is thus an argument that the attorney notes in this case do not even implicate the

issue that gave the D.C. Circuit pause in *CFA* and *BNA* because there is no showing that the

notes contain any *personal* content.  Based on this distinction, it might be possible to short-

circuit the analysis and simply conclude that the records at issue are not "personal" in nature and

thus can only be "agency records."  But to the extent that *CFA* and *BNA* stand for the proposition

that the Court must consider the "totality of the circumstances," including "the creation,

possession, control, and use of the document by the agency," *BNA*, 742 F.2d at 1490, 1492; *CFA*,

455 F.3d at 287, there is no reason to doubt that the test is sufficiently flexible and capacious to

apply to the present case.  The Court will therefore proceed to apply the principles identified in

those cases.

The Court begins with two premises that guided the D.C. Circuit in *CFA* and *BNA*.  First,

as a threshold matter, the Court must ensure "that '[t]he term 'agency records' . . . [is not]

manipulated to avoid the basic structure of the FOIA: records are presumptively disclosable

unless the government can show that one of the enumerated exemptions applies.'"  *CFA*, 455

F.3d at 287 (quoting *BNA*, 742 F.2d at 1494).  This means, among other things, that the Court

must avoid conflating the question whether records are "agency records" with the distinct

question whether those records can appropriately be withheld under a FOIA exemption.  *See*

*BNA*, 742 F.2d at 1494.  Second, as in *BNA* and *CFA*, two important facts are not in dispute—the

parties agree that the employee notes at issue here, like the calendars in those cases, "were

created by agency employees and were located within the agency."  *See CFA*, 455 F.3d at 289.

As a result, of the four "principal factors identified in [*BNA*]—creation, location/possession,

control and use"—the dispositive factors here are *control* and *use*.  *Id.* at 288.  The Court will address those two factors in turn.

   *i. Control.*  The SEC argues that it does not control the notes because the employees were not required to keep them, the SEC did not provide "any guidance on what notes to take or how to use them," and they were not incorporated into the SEC's files (or, alternatively and more specifically, into its file on the ESRT transaction).  *See* Dkt. 18 at 7–8; Dkt. 18-1 at 3 (Second Dennis Decl. ¶ 7).  But the Commission's assertions rest on misunderstandings of the law and facts.  As a matter of law, it is not at all clear whether the Federal Records Act ("FRA") or the SEC's regulations would have obligated the attorneys to maintain the notes that were the topic of Edelman's two requests.  *See CFA*, 455 F.3d at 289 ("Determining . . . whether the USDA employees are in fact free to dispose of their calendars . . . is a complicated endeavor, one that both parties largely avoid."); *cf. Forsham*, 445 U.S. at 183 & n.14 (defining "records" under the FRA as, *inter alia*, documents that serve as "evidence of the . . . activities of the Government").  Indeed, Edelman has provided the Court with a memorandum that appears to require that SEC employees preserve "[s]taff notes, including notes of meetings or phone calls" and "interview notes" for ten years after the close of an investigation, Dkt. 20-1 at 25, and it is difficult to imagine that the SEC does not at least require that its staff maintain some record of witness interviews.  But the Court need not conclusively decide this issue.  As the D.C. Circuit explained in *CFA*, there is no need to decide "whether retention of the [notes] was wholly within the officials' discretion," because it is clear that documents can be "agency records" under FOIA even if they need not have been preserved (or created) under federal law or agency practice.  *CFA*, 455 F.3d at 289.

The SEC also argues that the notes were not integrated into its "files"—a factor discussed in both *BNA* and in *Kissinger*.  But the question whether the notes were integrated into the SEC's "files" is a complicated one, driven as much by labels as by substance.  As the D.C. Circuit noted in *CFA*, *see id.* at 290, the Supreme Court's reference to agency "files" in *Kissinger* is difficult to interpret.  The Court stated in that case that the transcripts of calls made by Kissinger during his White House tenure did not become agency records under FOIA when he brought them to the State Department, because, among other things, they "never entered the . . . Department's files." 445 U.S. at 157.  But, as the *CFA* panel observed, it is not clear from *Kissinger* in what way the transcripts did not enter the State Department's files.  *See CFA*, 455 F.3d at 290 (observing that there is no "indication that the *Kissinger* Court used the term 'files' in a technical sense").  Here, there is little basis to believe that the notes did not enter the SEC's files under the commonsense meaning of that term.  The attorneys stored the "notes in their individual SEC offices," although it is unclear from the record whether those notes were kept exclusively in "paper files" or also on their "computer drives."  Dkt. 18-1 at 3 (Second Dennis Decl. ¶¶ 5, 7).  To the extent the notes were on the SEC's computer system, they were "necessarily subject[ed] . . . to the control of that system's administrators."  *See CFA*, 455 F.3d at 290.  And it is hard to understand why it would matter, for the purposes of FOIA, whether a document is kept on an attorney's agency computer or in her agency desk—at least to the extent the document concerns agency business rather than personal matters.  Indeed, it is safe to assume that some of the most consequential records in the government have at times resided in individual offices rather than in agencies' centralized filing systems.  Treating those records as beyond FOIA's reach cannot be squared with the statutory goal of "open[ing] agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425

U.S. 352, 372 (1976) (internal quotation marks omitted); *see Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772 (1989); *Tax Analysts*, 492 U.S. at 142.

   *ii. Use.*  The SEC responds that the distinction between keeping records in one's desk and keeping them on an agency shared drive is relevant to the final part of the *BNA* analysis: how the record was *used* within the agency.  The SEC argues that this factor is dispositive in this case, because the attorneys "did not share [the notes] with each other or any other SEC employee" and did not "incorporate any of these notes into the SEC's file on the ESRT transaction."  Dkt. 18-1 at 3 (Second Dennis Decl. ¶ 7).  Accordingly, the SEC contends, the notes are distinct from the employee calendars found to be agency records in *CFA* and *BNA*, which were "'distributed to other employees' rather than 'retained solely for the convenience of the individual officials.'" *CFA*, 455 F.3d at 291 (quoting *BNA*, 742 F.2d at 1496).  But the SEC places too much weight on isolated language from these cases.  The reason the D.C. Circuit focused on the distribution of the calendars in those cases was that their distribution served as evidence that they "were created for the purpose of conducting *agency business*."  *BNA*, 742 F.2d at 1496 (emphasis added).  By contrast, those calendars not distributed to other agency employees were likely "created for the *personal convenience* of individual officials so that they could organize *both their personal and business appointments*."  *Id.* (emphasis added).  The distinction observed by these courts makes sense: it is the distinction between records that may contain personal information (like doctor appointments, school plays, and planned vacations) that an employee uses to organize her days and those records that relate primarily to the business of the agency.

   The SEC argues that the notes here were created "for the personal convenience" of the SEC attorneys, too, in that the employees were not required to take notes during the calls and meetings but instead simply found it convenient to do so.  But this argument also misunderstands

the nature of the exception for personal records.  The fact that the attorneys were not required to take notes does not mean that, when they did so, they were doing so for personal reasons rather than professional ones.  Nothing in the record here suggests that the attorneys' notes were akin to "a personal diary containing an individual's private reflections on his or her work—but which the individual does not rely upon to perform his or her duties."  *Id.* at 1493.  Instead, what little evidence the SEC has submitted shows that the notes "facilitated the day-to-day operations of the" SEC's review of the ESRT transaction, whether or not they were incorporated into the official file that was created to accompany that review.  *Id.* at 1495.  It is thus incorrect to assert that the notes were created for the "*personal* convenience" of the attorneys; it is more accurate to say that they were created for attorneys' "*professional* convenience."  Such records are not categorically shielded from FOIA's reach, whether or not they were distributed within the agency.  To make distribution the centerpiece of the "agency records" analysis cannot be squared with the purposes of FOIA.  Under the SEC's view, the notes that Kissinger took while Secretary of State would have been protected from FOIA if he had kept them in his desk but would have been subject to the Act had he shared them with Department staff.  Such a rule would permit agency officials to evade FOIA simply by locking away the notes they use to conduct agency business, regardless of their content or their importance.  That is inconsistent with the spirit and the letter of the law.

Many of the district courts to have addressed this question in the past have acted out of a concern for the chilling effect that a contrary conclusion could have on agency business.  *See, e.g.*, *British Airports Auth.*, 531 F. Supp. at 416 (reasoning that the disclosure of such documents would have an "adverse effect . . . on the day-to-day work routines of agency officials").  *But see BNA*, 742 F.2d at 1494 (disapproving of this reasoning and stating that "[t]he policy concerns

underlying the court's opinion are addressed more appropriately to the applicability of particular [FOIA] exemptions"). The Court is sensitive to that concern. In particular, the Court is cognizant of the impact that the disclosure of employees' notes might have on those employees' willingness to take notes at all. But as the *BNA* Court observed, there are natural limits on the impact of the Court's interpretation of FOIA. Importantly, many of the notes that may be subject to the Court's interpretation will likely be exempt from disclosure under one of FOIA's statutory exemptions. *See* 5 U.S.C. § 552(b)(5); *BNA*, 742 F.3d 1494 (noting that some material will be exempt under Exemption 5). The Court's conclusion today says nothing about whether the notes in this case must be disclosed.

Indeed, the conclusion the Court reaches today is a limited one. The Court does not hold that all notes taken by all agency employees while at work are "agency records" under FOIA. Some such notes may contain personal information, like the calendars considered in *CFA* and *BNA*. And, although the question is not before the Court, even some records that may properly be attributable to the "agency" under the principles described above may not qualify as "agency *records*" because they are not "records" at all. *See Forsham*, 445 U.S. at 183–84 (looking to various federal statutes defining "records"); *see also* 44 U.S.C. § 2201(2) (defining "Presidential records" to include "documentary materials . . . created or received by the President [or his or her staff] in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President"); *id.* § 3301 (defining "records" under the Federal Records Act as information "made or received by a Federal Agency . . . in connection with the transaction of public business" that is "evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government"). An agency might plausibly conclude, for instance, that notes that

do not provide any real insight into the operation of government do not constitute "records" of that agency's activities.  But such an argument has not been advanced here, and so the Court has no need to consider it.  All the Court concludes at this juncture is that the notes in this case are not categorically exempt from FOIA simply because they were maintained and used exclusively by their authors.

Because the SEC concluded as a categorical matter that the attorney notes here were not "agency records" under FOIA, it did not search or index them, and thus the Court lacks any basis to determine whether any individual documents (or portions of documents) are either not subject to FOIA or not subject to disclosure under FOIA.  What is clear from the present record is only that the notes are not categorically exempt from FOIA on the sole ground that they were maintained and used exclusively by their authors.  Accordingly, the Court will order the SEC to search the 113 pages and file a supplemental *Vaughn* index responsive to the considerations set out in this Opinion.  If the SEC concludes that, in light of this Opinion, certain portions of the notes are not "agency records," it may renew its arguments with respect to those portions, but it shall simultaneously assert whatever exemptions it deems applicable.  To the extent that the SEC concludes that (1) specific pages are "agency records" in light of the Court's analysis, (2) those pages are responsive to Edelman's requests, and (3) no exemptions apply, it should produce those pages to Edelman.  The timing of these obligations will be set in the Court's concurrent Order.

b.   Scope of Search

Edelman also argues is that the SEC erred in construing his request to encompass only documents *about* "consumer complaints" regarding ESRT, not the complaints themselves.  Dkt. 16-1 at 14; Dkt. 20 at 5–7.  Edelman submitted this request (and all the others) on the SEC's

FOIA website, which contains a drop-down menu that permits requesters to select the "[t]ype of document" they wish to receive. *Request for Copies of Documents*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/forms/request_public_docs (last visited Mar. 23, 2016). Edelman selected "[c]onsumer complaints" from the drop-down menu. Dkt. 15-3 at 5 (Livornese Decl., Ex. 2). In a second field on the website, labeled "[o]ther pertinent information," he then described a set of complaints submitted by Empire State Building investors during the ESRT review process, stated that the same attorneys described above had interviewed those investors, and asked for "all notes, reports, emails or any other accounts from these interviews" and "all emails to and from the . . . SEC lawyers where those complaints and interviews are discussed." *Id.* In its initial response to Edelman, the SEC referred to this as a request for "all consumer complaint records concerning [ESRT], to include e-mail messages to and from [the attorneys] where consumer complaints and interviews were discussed." *Id.* at 7 (Livornese Decl., Ex. 3).

It is not clear from the record exactly what documents the SEC produced in response to this request, but the parties agree that the SEC did not produce all—and may not have produced any—of the consumer complaints themselves. The declarations submitted by the SEC suggest that the Commission divided the request into two categories: one for "notes, reports, emails or any other accounts from . . . interviews with investors" who submitted complaints and the other for "emails to and from the . . . SEC lawyers where those complaints and interviews are discussed." Dkt. 15-1 at 2–3 (Livornese Decl. ¶ 5); Dkt. 18-1 at 2 (Second Dennis Decl. ¶ 4). Dennis, who was tasked with responding to this request, declared that she submitted "1,961 pages of emails, 47 pages of notes, 24 pages of meeting logs, and a two-page memo" for production in response to the request. *See* Dkt. 15-2 at 2 (Dennis Decl. ¶ 6). The *Vaughn* index submitted by the SEC suggests that the agency released roughly 64 pages of documents logging

the complaints it received, but it is not clear from the record whether the SEC retained copies of the complaints themselves.  *See* Dkt. 15-5 at 1 (*Vaughn* Index).  At least one document produced to Edelman suggests that, at one time, the complaints were "scanned into a Sharepoint site," but the contents of that site do not appear to have been produced.  Dkt. 20-1 at 15 (Second Edelman Decl., Ex. R).

In any event, the SEC argues that it was under no obligation to produce the complaints because Edelman's request "did not seek complaints."  Dkt. 18 at 5.  Rather, the SEC contends, Edelman "sought notes, reports, emails or other accounts from interviews with" the investors who submitted the complaints, as well as e-mails between SEC employees *about* the complaints and interviews.  *Id.*  Under this view, Edelman did not seek complaints, but rather sought records regarding the SEC's *response* to the complaints.  The SEC's interpretation is not far-fetched:  It is possible to read Edelman's account of the complaints themselves as background information for his request for records regarding the agency's response to those complaints.  But the D.C. Circuit has emphasized that agencies are obligated "to construe a FOIA request liberally," *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)), and here the more "liberal" reading of Edelman's request is also, in the Court's view, the more natural one.  Although it would have been reasonable for the SEC to assume that Edelman was primarily interested in the SEC's responses to consumer complaints, that does not mean that he was uninterested in the complaints themselves—if for no other reason than to contextualize the SEC's responses.  Indeed, the SEC appears to have originally understood Edelman's request in exactly this way.  *See* Dkt. 15-3 at 7 (Livornese Decl., Ex. 3) (describing Edelman's as a request for "all consumer complaint records concerning [ESRT]").

34

It is not entirely clear that there are additional records remaining for the SEC to produce in response to this request.  *See* Dkt. 15-5 at 1 (*Vaughn* Index) (listing "table of . . . complaints received" as one document produced by the SEC).  But the Court will nonetheless direct that it conduct an additional search in response to this request, on the understanding that—properly read—the request encompasses not just documents *about* the complaints but the complaints *themselves*.  The timing of these obligations will be set in the Court's concurrent Order.

c.    Adequacy of Search

Edelman finally argues that the SEC conducted an inadequate search even for documents *about* complaints submitted by Empire State Building investors.  *See* Dkt. 16-1 at 14–15; Dkt. 20 at 7–11.  He advances several arguments in support of this claim: that the SEC erred at the outset in issuing a *Glomar* response, that the SEC failed to search sufficient sources of information for potentially responsive records, and that the SEC did not produce certain e-mails that he posits it must have had in its possession.  None of Edelman's arguments persuades the Court that the SEC conducted an inadequate search for documents about investor complaints.

First, Edelman argues that the SEC erred in initially responding to his request for records with a *Glomar* letter.  *See* Dkt. 15-3 at 7 (Livornese Decl., Ex. 3) (explaining that the SEC could "neither confirm nor deny the existence of any records responsive to" Edelman's FOIA request).  But, as Edelman acknowledges, the SEC subsequently withdrew its *Glomar* response and instead conducted a search for responsive records.  *Id.* at 10 (Livornese Decl., Ex. 4); *id.* at 12–15 (Ex. 5).  It ultimately produced over 2,000 pages of records in response to Edelman's request.  *Id.* at 13.  Edelman points to no relief to which he is entitled as a result of the SEC's withdrawn *Glomar* response; he argues only that the response "was improper and cannot be justified," that it "improperly delayed [the] SEC's response" on the merits, and that it "provides clear evidence of

SEC's bad faith in its dealings with" him.  Dkt. 20 at 9–10.  But even if the SEC's *Glomar*

response was improper at the time it was issued—a question the Court need not resolve—

Edelman provides no reason to believe that it was issued for the purpose of delaying the SEC's

eventual production of documents, nor is there any evidence that it was issued in "bad faith."

The *Glomar* response thus has no bearing on whether the search the SEC eventually conducted

was adequate.

Second, and more to the point, Edelman argues that the SEC failed to conduct a "broad"

search for "notes, reports, emails [and] other accounts" from interviews with the investors who

submitted complaints.  Dkt. 16-1 at 15.  Although Dennis attests that the Commission searched

the emails and files of the three attorneys who worked on the ESRT review, *see* Dkt. 23 at 3

(Dennis Decl. ¶ 5), Edelman argues that this search was unresponsive to his request for

"reports . . .  and other accounts."  He contends that "[p]otential sources of 'reports' and 'other

accounts[]' clearly suggest a broader search than a perusal of emails and personal files by the

three staff attorneys," as "[s]uch information would likely migrate to other sources or be stored

in other types of agency records that were not considered."  *See* Dkt. 16-1 at 15.  But "[t]here is

no requirement that an agency search every record system" in response to a FOIA request.

*Oglesby*, 920 F.2d at 68.  An agency's only obligation is to "us[e] methods which can be

reasonably expected to produce the information requested."  *Id.*  Here, Edelman identifies no

reason why the SEC's search would not have produced the information he requested, and the

Court can think of none.

Edelman finally argues that the SEC's search was too narrow because it did not produce

emails or records relating to two complaints that *he* submitted regarding the ESRT transaction.

Dkt. 16-1 at 14; *see* Dkt. 16-2 at 10 (Edelman Decl. ¶ 33); *id.* at 67 (Ex. M).  Edelman posits that

there "should have been follow-up interviews" with the investors whose e-mails he forwarded to the SEC, "and possibly internal emails and notes about these two complaints, but no such records were produced." Dkt. 16-2 at 10 (Edelman Decl. ¶ 33). But it "is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). That is particularly true where, as here, Edelman identifies no evidence—as opposed to supposition— that the documents he seeks were ever created. *See Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994) ("[M]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search." (internal quotation marks omitted)). It is possible that the SEC attorneys discussed Edelman's complaints only in person, or that they never discussed these specific complaints at all. And to the extent that Edelman argues that the logs and lists of complaints that the SEC did produce do not refer to complaints that he believes were submitted, *see* Dkt. 20-1 at 3–4 (Second Edelman Decl. ¶¶ 8– 9), the fact that the SEC may have failed to document certain calls or complaints, even if it was required to do so, does not mean that the SEC has violated FOIA. *See Iturralde*, 315 F.3d at 315 ("After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them.").

The Court, accordingly, concludes that the SEC conducted a reasonable and adequate search for documents *about* complaints submitted by Empire State Building investors.

3.    *Remaining Searches*

Edelman raises no specific objections to the remainder of the SEC's efforts to search for records responsive to his FOIA requests. Instead, he levies a broad attack on the SEC's overall responsiveness to his requests. Dkt. 16-1 at 13; Dkt. 20 at 3–4. He alleges that the SEC failed to

comply with FOIA's requirement that agencies "make . . . records promptly available" to FOIA requesters, 5 U.S.C. § 552(a)(3)(A), by not producing records until, on average, over six months after he submitted his requests.  He argues that this "inexcusable delay . . . undermine[s] the letter and spirit of the FOIA," and, along with other factors, undermines "the presumption of good faith to which the SEC claims entitlement."  Dkt. 16-1 at 13–14.  But "initial delays in responding to a FOIA request are rarely, if ever, grounds for discrediting later affidavits by the agency," *Iturralde*, 315 F.3d at 315, and there is nothing about the SEC's delay in this case that persuades the Court that it conducted its searches in anything other than good faith.  Edelman's requests were broad, and required the SEC to search through its enforcement files and e-mail systems for several topics of interest.  Edelman is correct that the SEC exceeded the statutory deadline for responding to the requests, but there is no evidence that it did so in an extreme or egregious way.  The Court sees no basis to question the SEC's good faith.

With respect to the remaining searches, the Court has reviewed the declarations submitted by the SEC and is persuaded that the searches were reasonable and adequate.  *See Iturralde*, 315 F.3d at 313.  The Court will, accordingly, grant summary judgment to the SEC with respect to the adequacy of its searches, but will order additional searches and, if necessary, the production of an additional *Vaughn* index, with respect to the two issues described above.

## C.    Withholdings

The remaining question is whether the SEC appropriately withheld material from the 2,000 or more pages it did produce to Edelman on the basis of Exemptions 5 and 6.  Edelman does not challenge any of the SEC's Exemption 6 withholdings, and challenges only the SEC's invocation of Exemption 5 only with respect to six specific documents: Documents 1, 5, 6, 7, 8, and 47.  Dkt. 16-1 at 19–21; Dkt. 20 at 16–17.  Accordingly, as an initial matter, the Court will

grant the SEC's motion for summary judgment with respect to all of its withholdings except for those Edelman has specifically challenged—which, in any event, appear on the Court's review to be appropriate.  *See Augustus v. McHugh*, 870 F. Supp. 2d 167, 172 (D.D.C. 2012).  The Court will discuss only the SEC's withholdings under Exemption 5 that Edelman challenges in his opposition and cross-motion.

The SEC withheld material in a number of documents on the basis of Exemption 5.  That exemption protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *See* 5 U.S.C. § 552(b)(5).  The Supreme Court has explained that Exemption 5 shields "those documents, and *only* those documents, normally privileged in the civil discovery context."  *Sears, Roebuck*, 421 U.S. at 149.  Here, the SEC withheld information only under the deliberative-process privilege, which "allows an agency to withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'"  *Elec. Frontier Found. v. U.S. Dep't of Justice* (*EFF*), 739 F.3d 1, 4 (D.C. Cir. 2014) (quoting *Sears, Roebuck*, 421 U.S. at 153).  The privilege is "limited to documents that are 'predecisional' and 'deliberative,' meaning 'they reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'"  *Id.* (quoting *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 875 (D.C. Cir. 2010)) (alterations in *EFF*).

Edelman challenges the agency's withholdings only from what the SEC refers to as Documents 1, 5, 6, 78, and 47.  The Court will address each document in turn.

1.    *Document 1*

Document 1 is "an internal memo to file drafted by SEC attorneys" regarding the ESRT

review process.  Dkt. 15-1 at 14 (Livornese Decl. ¶ 48); *see* Dkt. 20-1 at 14–15 (Document 1).

The SEC explains that it redacted three sentences from the memo "because they reflect pre-

decisional deliberations about how to handle complaints within the SEC."  Dkt. 15 at 10.

Edelman levies two arguments about why the redacted sentences were improperly withheld

under Exemption 5.  First, he argues that the sentences cannot be "predecisional" because the

memo was not written until *after* the SEC approved the ESRT purchase offer.  Dkt. 16-1 at 18–

19.  As several courts have observed, however, "post-decisional documents can fall under the

privilege where they recount or reflect predecisional deliberations."  *Citizens for Responsibility*

*& Ethics in Washington v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217, 234 (D.D.C. 2009); *North*

*Dartmouth Props., Inc v. HUD*, 984 F. Supp. 65, 68 (D. Mass. 1997).  The SEC represents that

this is exactly what happened here: the sentences "reflect internal deliberations that took place

*before* the IPO . . . [regarding] how to handle certain aspects of the numerous consumer

complaints that the ESRT transaction generated."  Dkt. 18 at 10 (emphasis added).

But the SEC fares less well with respect to Edelman's second argument, which is that the

context of the sentences suggests that the withheld material is a "factual recitation of past events

describing how the SEC handled the complaints," and is therefore not "deliberative."  Dkt. 16-1

at 19.  Edelman's argument has some force.  The D.C. Circuit has explained that the deliberative-

process privilege primarily protects documents that "make[] recommendations or express[]

opinions on legal or policy matters."  *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C.

Cir. 1978) (en banc) (quoting *Vaughn*, 523 F.2d at 1144); *see also Pub. Citizen*, 598 F.3d at 876

("Only those portions of a predecisional document that reflect the give and take of the

deliberative process may be withheld.").  And the privilege does not protect statements that

supplied "the basis for an agency policy actually adopted."  *EFF*, 739 F.3d at 7 (quoting *Sears,*

*Roebuck*, 421 U.S. at 153).  Here, it is not possible to determine based on the redacted version of

Document 1 and the SEC's declarations whether the redacted portions reflect "recommendations

or . . . opinions on legal or policy matters."  *Jordan*, 591 F.2d at 774.  Overall, the document

appears to detail the *process* the SEC adopted to respond to complaints and to formulate policy

positions.  The Court cannot foreclose the possibility, however, that the redacted portions go

beyond the description of process detailed in the remainder of the memorandum.  *Cf. Public*

*Citizen*, 598 F.3d at 876 (noting that agencies must disclose factual information unless it

"inevitably reveal[s] the government's deliberations" (internal quotation marks omitted)).

Accordingly, the Court will order the SEC to produce an unredacted version of Document 1 for

*in camera* review.  The SEC may file an *in camera* declaration with its production explaining

why, in its view, the release of the redacted material would compromise its decisionmaking

process.  The timing of these obligations will be set in the Court's concurrent Order.

  2. *Document 5*

  Document 5 is "an internal table of tips and complaints compiled by three SEC attorneys"

that contained four columns describing the tips and complaints the SEC received.  *See* Dkt. 15-1

at 14 (Livornese Decl. ¶ 48); Dkt. 16-1 at 19.  The fourth column, "Notes," was initially redacted

in full under Exemption 5 "because the notes reflect[ed] predecisional deliberations about how to

handle complaints."  Dkt. 15-1 at 14 (Livornese Decl. ¶ 48).  After Edelman filed his brief in this

matter, the SEC made a "discretionary release" of some of the comments in the "Notes" column,

but continues to withhold the remaining comments on the basis of Exemption 5.  Dkt. 18 at 9.  It

argues that the remaining comments "represent[] an attorney's ongoing and contemporaneous

thoughts about each of the complaints, the individual issues that could arise because of these complaints, and what, if any, action was contemplated as result of these complaints." *Id.* at 10. The SEC asserts that release of the withheld comments would have a "chilling effect" on future predecisional discussion and debate, and argues that they were properly withheld on the basis of Exemption 5. *Id.* at 9.

Edelman does not genuinely contest that some of the withheld material might have been properly withheld on the basis of Exemption 5, but argues instead that the SEC's declarations and *Vaughn* index are insufficiently detailed to support the invocation of the privilege. Dkt. 20 at 17–18. He argues that the SEC should be required to state "the deliberative processes involved" with respect to each item in the table and "the basis for any dire consequences that would result from their disclosure." *Id.* at 17. He also contends that the SEC has "failed to demonstrate that all of the withheld information is comprised of advice and recommendations, and is not factual." *Id.* The Court concludes that the SEC has carried its burden with respect to Document 5. Based on the parties' description of the table, it is not surprising that there would be no factual material in the "notes" column; the remaining columns contain only factual content, leaving the "notes" column for the attorneys to record their subjective opinions about the complaints and tips. And the Court sees no basis to require the SEC to specify the decisions to which each specific comment was antecedent; the table was compiled in anticipation of the SEC's determination about whether to allow the ESRT transaction to proceed. Edelman provides no genuine basis with which to question the SEC's declarations, and no basis for doubting that Exemption 5 was properly invoked.

3.      *Documents 6–8*

The SEC withheld Documents 6 through 8 in full under Exemption 5.  Dkt. 15-1 at 14

(Livornese Decl. ¶ 48).  Document 6 consists of "draft comments" regarding two forms ESRT

was required to submit; it was withheld because it "contains recommendations as to what should

be included in comments to ESRT."  *Id.*  Document 7 consists of "typewritten notes regarding

ESRT's proposed initial public offering"; it was withheld because it contains questions and

"predecisional deliberations about issues raised by ESRT's filing."  *Id.*  Document 8 is a

"memorandum containing talking points regarding investor complaints"; it was withheld because

it "contains recommendations about points to make in calls with investors."  *Id.*

Edelman argues that these documents were not appropriately withheld under Exemption

5 because they are not "predecisional."  Dkt. 16-1 at 20.  Specifically, he argues that Documents

7 and 8 must be post-decisional because "notes" and "talking points" necessarily "reflect agency

policies that have already been determined and merely are being carried out."  *Id.*  But there is no

basis for that inference.  The SEC explains that both documents were *pre*decisional: the notes

predated the agency's decision with respect to ESRT's filings and raised questions and

deliberations about those filings, and the talking points predated the attorneys' calls with

investors and included suggestions about how to handle those calls.  Dkt. 18 at 11.  Edelman's

argument as to Document 6 is no more persuasive.  He argues that the Commission should not be

permitted to shield the comments by labeling them "draft."  But courts frequently permit

agencies to withhold drafts of documents, particularly where, as here, final versions of those

documents are later released to the public.  *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254,

257–58 (D.C. Cir. 1982); *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14-1806,

2016 WL 544463, at *6–7 (D.D.C. Feb. 10, 2016) (canvassing caselaw).  To the extent the drafts

differ from the final version, those differences likely reflect the agency's internal deliberations. Edelman provides no reason for the Court to reach a contrary determination.

The Court, accordingly, concludes that the SEC appropriately withheld Documents 6 through 8 on the basis of the deliberative process privilege.

4.   *Document 47*

Finally, the SEC describes Document 47 as an "internal email containing deliberative comments about the ESRT filing review."  Dkt. 15-1 at 15 (Livornese Decl. ¶ 48).  Edelman describes it as an email from an investor that one SEC employee forwarded to two other SEC employees.  Dkt. 16-1 at 20–21.  According to Edelman, the portion of the email containing the SEC employee's comments was withheld, although the underlying email was not.  *Id.* at 21. Based on these descriptions, it appears that one SEC employee forwarded the investor's email to another employee, and the text of the employee's "cover" email to the other employee contained "deliberative comments."

The SEC states that it withheld these comments, which it says are "comment[s] on issues being considered in connection with the filing review," because they "reflect[ed] predecisional deliberations about ESRT's filing."  Dkt. 15-1 at 15 (Livornese Decl. ¶ 48).  Edelman argues, again, that "no decision is identified, and thus no predecisional deliberation can be presumed." Dkt. 16-1 at 21.  But the very reason that the investors submitted complaints to the SEC was that the SEC had to decide whether to approve the ESRT transaction.  Edelman's contention that the SEC's briefs and declarations fail to identify the "decision" to which the withheld comments referred is difficult to square with this reality.  The Court, accordingly, concludes that the SEC appropriately withheld a portion of Document 47 on the basis of the deliberative process privilege.

## CONCLUSION

For these reasons, the Court will **GRANT** in part and **DENY** in part each party's motion for summary judgment.  A separate Order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 24, 2016